January 19, 1978

**78-2    MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL, CRIMINAL
DIVISION**

### Rebates in Violation of Shipping Act—Applicability of Conspiracy Statute (18 U.S.C. § 371)

This responds to your inquiry concerning a group of cases involving ocean freight rebating. The question is whether the 1972 amendment to § 16 of the Shipping Act of 1916 precludes conspiracy prosecutions under 18 U.S.C. § 371 in these cases. The Fraud Section of the Criminal Division has taken the position that the cases may be prosecuted under the conspiracy statute; the Government Regulations and Labor Sections disagree.

Our conclusions may be summarized as follows:

> As a general matter, a statutory prohibition the violation of which is subject only to a civil penalty may be an "offense against the United States" for purposes of the conspiracy statute. The 1972 amendment to § 16 does not rule out the possibility of prosecuting a corporate shipper and a corporate carrier for conspiring to violate paragraph Second of § 16. Congress' action, as well as principles analogous to those underlying the Wharton rule, indicate, however, that any such prosecution must be based upon more than a minimal or ordinary violation of the provisions of the Shipping Act. That is, the prosecution must be able to show, that because of its nature or extent, the conduct contemplated by the conspiracy agreement involved harm to society beyond that ordinarily presented by the substantive offense itself. Similarly, depending upon the particular circumstances, cases of the present type may constitute a conspiracy to defraud the Federal Maritime Commission.

We are, however, not familiar enough with the facts of the present cases to make specific recommendations.

### Background

1. Section 16 of the Shipping Act of 1916, as amended, 46 U.S.C. § 815 (1975 Supp.), reads as follows:

5

It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable.

*It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly —*

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . .

*Second. To allow any person to obtain transportation for property at less than the regular rates or charges then established and enforced on the line of such carrier by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means.*

Third. To induce, persuade, or otherwise influence any marine insurance company or underwriter, or agent thereof, not to give a competing carrier by water as favorable a rate of insurance on vessel or cargo, as is granted to such carrier or other person subject to this chapter.

*Whoever violates any provision of this section other than paragraphs First and Third hereof shall be subject to a civil penalty* of not more than $5,000 for each such violation.

Whoever violates paragraphs First and Third hereof shall be guilty of a misdemeanor punishable by a fine of not more than $5,000 for each offense. [Emphasis added.]

The principal provision discussed herein is paragraph Second.

2. Investigations of ocean freight rebate practices are being conducted by the U.S. Attorneys (regarding several carriers, including United States Lines and Sealand Services, Inc. and Seatrain Lines, Inc.). As a result of one of these investigations, Sealand has made extensive disclosures to the Federal Maritime Commission concerning rebates amounting to some $19 million and has agreed to pay a civil penalty of almost $5 million. The U.S. Attorney in Newark has forwarded to some 53 other U.S. Attorneys cases involving more than 300 shippers that received the rebates.

Your memorandum indicates that:

The investigations have disclosed that employees of the carriers would obtain freight business by agreeing with employees or officers of the shippers to pay freight rate rebates. Books and records of the carriers were falsified by identifying rebate payments as, *inter alia,*

6

"promotional expenses." Rebate payments were made by laundering the funds through both domestic and overseas subsidiaries of the carriers, obviously with the assistance and knowledge of employees of the subsidiaries.

## Discussion

1. This inquiry relates to the possibility of prosecution under the general conspiracy statute. That statute, 18 U.S.C. § 371, provides as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

It is established that, for purposes of 18 U.S.C. § 371, the term "offense against the United States" is not limited to crimes.[1] It also encompasses conduct prohibited by a Federal statute and "made punishable only by a civil suit for a statutory penalty." *Hunsaker* v. *United States, infra*, at 112. Thus, it may follow that violation of paragraph Second of § 16 as amended, which is punishable by civil penalty, is an "offense" within the meaning of 18 U.S.C. § 371.[2] The first issue is whether that result is foreclosed, because of the 1972 amendment to § 16.

2. Section 16 of the Shipping Act prohibits several types of practices by shippers, common carriers by water, and others. Before the 1972 amendment of § 16, violation of any of those prohibitions was a misdemeanor punishable by a fine of not more than $5,000.[3] The principal effect of the 1972 legislation is to provide, with respect to paragraph Second and all other provisions except paragraphs First and Third, that a violation thereof is no longer a crime, but is subject to a civil penalty.[4]

The legislative history of the 1972 amendment is brief and contains no

---

[1]*See United States* v. *Hutto,* 256 U.S. 524, 529 (1921) (offense of Federal official's having financial interest in Indian trade); *Hunsaker* v. *United States,* 279 F. (2d) 111, 112 (9th Cir. 1960), cert. denied, 464 U.S. 819 (1960) (Gold Reserve Act); *United States* v. *Weisner,* 216 F. (2d) 739, 742 (2d Cir. 1954) (Gold Reserve Act). In *Weisner,* the court rejected the argument that 18 U.S.C. § 1, which deals with the classification of criminal offenses, governed the meaning of "offense" for purposes of 18 U.S.C. § 371.

[2]It should be noted that § 16, as amended, refers to a civil penalty for each "violation" of paragraph Second. In contrast, with regard to paragraph First and Third, the statute refers to a fine for each "offense." There is no reason, however, to treat this difference in terminology as decisive regarding the applicability of 18 U.S.C. § 371.

[3]*See* 46 U.S.C. § 815 (1970).

[4]*See* Pub. L. No. 92-416 (1972), § 1(b).

mention of the possibility of prosecutions under the conspiracy statute. Thus, an effort must be made to infer Congress' intent.

The bill which was ultimately enacted differed in certain respects from the version introduced and initially passed by the House of Representatives. As enacted, the law provides that the civil penalties for violation of the Shipping Act "may be compromised by the Federal Maritime Commission, or may be recovered by the United States in a civil action."[5] The original House bill contained the change from criminal to civil sanctions, but under that bill [6] the Federal Maritime Commission would have been empowered to assess the civil penalties, subject to review of its action in the courts of appeals.

The purpose of the House bill was to strengthen the ability of the Commission to carry out its regulatory functions under the Shipping Act, in part by amending the penalty provisions in the "areas that give the Commission most of its enforcement problems in day-to-day operations."[7] The House report stated that the then-existing situation (i.e., investigation of matters by the Commission and referral to the Department of Justice for prosecution) was unsatisfactory because it involved delay and also overlapping of effort on the part of the Commission and the Department.[8] Another disadvantage cited in the House report was that frequently (because of the time elapsed between the occurrence of the infraction and the criminal trial) the sentence imposed by the courts was too light and was insufficient to defer future violations.[9]

Although the House report stressed that the amendments would mean more effective regulation by the Commission, it also said that the proposed procedure (assessment of penalties by the Commission, with review in the courts of appeals) "would, in most instances, reduce the total litigation expenses to both the Government and private parties [and] relieve the overburdened Federal courts . . . ."[10]

The Senate, however, amended the bill so as to restrict the authority of the Commission to seeking to compromise a civil penalty. Thus, under the Senate bill (which was enacted), absent such a compromise, the Commission may refer the matter to the Department of Justice for the bringing of a civil action to recover a penalty.

Evidently, the basis for the Senate amendment to the House bill was industry opposition to granting the Commission authority to assess civil penalties.[11] The Senate report referred to "contentions" that such a procedure would be contrary to due process, because the "nature of the administrative agency process necessarily makes the agency . . . ill-suited for the imposition of punitive sanctions."[12]

---

[5] Id., § 3; 46 U.S.C. 814 note (1975 Supp.).
[6] See 117 Cong. Rec. 32415 (1971).
[7] H. Rept. No. 92-478, 92d Cong., 1st sess. (1971), p. 1.
[8] Id., p. 2.
[9] Id., p. 3.
[10] Id., p. 4.
[11] See S. Rept. No. 92-1014, 92d Cong., 2d sess. (1972), p. 3.
[12] Id., p. 2.

In explaining the shift from criminal sanctions to civil, the Senate report noted, as did the House report, the unsatisfactory, time-consuming nature of the then-existing means of enforcement.[13] Furthermore, the Senate report stated:

> To change the penalties for violations of these provisions from criminal to civil should make the documentation of violations simpler, thereby expediting final consideration by the Commission, or the Department of Justice and the courts. Since proving a violation would be easier, the threat of imposition of the prescribed penalty should act as a more effective deterrent to further violations.

Continuing, the Senate report stated[14] that enactment of the bill

> . . . should provide the Federal Maritime Commission with needed additional authority to more effectively discharge its statutory · responsibilities, encourage compromised settlements for violations of the shipping statutes, and help to avoid needless litigation in our over-crowed [sic] Federal courts.

The legislative history indicates that Congress' main purpose in substituting civil sanctions was to enhance enforcement by the Commission. The possibility of bringing conspiracy prosecutions seems consistent with the main purpose of the 1972 amendments. Such prosecutions need not interfere with enforcement by the Commission and, indeed, could be a useful supplement. Still, consideration must be given to other objectives mentioned in the congressional reports.

The House report and, to a lesser extent, the Senate report expressed concern regarding duplication of effort by the Commission and the Department. This problem could be exacerbated if, for example, there should be a conspiracy prosecution in regard to a matter that had already been the subject of a Commission investigation and a civil action for recovery of a penalty.

Both of the reports indicated a desire to avoid increasing the backlog of cases in the Federal courts. This may be some evidence that, except for the means provided in § 16, Congress did not contemplate Federal enforcement in this area.

As the Fifth Circuit has pointed out,[15] the 1972 amendments were clearly not based upon a belief that criminal punishment was too severe. Both committee reports stressed the need for a more effective deterrent. Nonetheless, Congress was also concerned with fairness to the regulated firms and, in particular, with reducing their litigation expense (as well as that of the Government). This is another aspect of congressional intent that casts doubt on the availability of conspiracy prosecutions.

Finally, it must be noted that Congress could have provided for both civil and

---

[13]S. Rept., p. 2.

[14]Id., p. 3.

[15]United States v. Blue Sea Line, 553 F. (2d) 445, 450 (5th Cir. 1977) (upholding the dismissal of indictments charging pre-1972 rebates in violation of § 16, paragraph Second).

criminal sanctions for violation of the provisions in question, but did not do so.[16]

The basic conclusion we draw from the legislative history is that there is no absolute conflict between Congress' intent in amending § 16 and the bringing of conspiracy prosecutions in this area. On the other hand, the concerns expressed by the congressional committees with regard to avoiding overlap between the Commission and the Department, fairness to regulated entities, and reducing the burden on the courts are entitled to some weight. Those concerns suggest that if there are to be conspiracy prosecutions related to violations of § 16 great care must be used in selecting the cases. For reasons discussed below, the same conclusions are suggested by principles analogous to those underlying the Wharton rule.

.3. The nature of the Wharton rule was thoroughly considered by the Supreme Court in *Iannelli* v. *United States*, 420 U.S. 770 (1975).[17] The Court described the rule by quoting from its original source, Wharton's treatise on criminal law:[18]

> When to the idea of an offense [*e.g.*, dueling] plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained . . . .

Had the present issues arisen before the 1972 amendment of § 16—that is, when criminal sanctions were prescribed for conduct such as rebating—it would have been necessary to determine the applicability of the Wharton rule. In our opinion, however, because the substantive violations are no longer crimes, the Wharton rule as such does not apply.[19]

Nonetheless, since the substantive violations are "offenses" for the purpose of 18 U.S.C. § 371, it should be proper to consider principles similar to those underlying the Wharton rule. In *Iannelli*, the Court stated, 420 U.S., at 782, that the Wharton rule does not rest on principles of double jeopardy,[20] but is merely a "judicial presumption, to be applied in the absence of legislative intent to the contrary." The rule was explained as follows (420 U.S. at 785-86, footnotes omitted):

---

[16]For example, willful violations might have been made subject to criminal sanctions.

The Department of Justice sent a report on the House bill to both the House and the Senate committees. *See* H. Rept., p. 10; S. Rept., p. 6. The Department stated that it had no objection to enactment of the bill. Its report did not suggest the need to retain criminal sanctions and did not mention the possibility of prosecutions under 18 U.S.C. § 371.

[17]In *Iannelli*, the Court, in a five-to-four decision, sustained convictions for violation of 18 U.S.C. § 1955, prohibiting large-scale gambling activities, and for conspiring to commit that offense.

[18]420 U.S. at 773, quoting 2 F. Wharton, *Criminal Law* § 1604 (12th ed., 1932) p. 1862.

[19]One indication that the rule applies only when the substantive offense is a crime is the discussion in *Iannelli* of the procedural effect of the rule. The Court stated, 420 U.S. at 786, footnote 18, that in cases covered by the rule dismissal of the conspiracy charge is not required. The Court added, "When both charges are considered at a single trial, the real problem is the avoidance of dual punishment. This problem is analogous to that presented by the threat of conviction for a greater and a lesser included offense, and should be treated in a similar manner."

[20]*But see* footnote 19, *supra*.

10

Wharton's Rule applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents. In such cases, a closer relationship exists between the conspiracy and the substantive offense because *both* require collective criminal activity. The substantive offense therefore presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter. Thus, absent legislative intent to the contrary, the Rule supports a presumption that the two merge when the substantive offense is proved. [Emphasis as in original.]

Here, the question raised is whether violation of § 16, paragraph Second, *requires* concerted activity. If so, it could be argued, by analogy to the Wharton rule, that Congress did not intend any separate sanction for a two-party conspiracy to commit that offense.[21]

Under paragraph Second, it is "unlawful for any common carrier by water . . . alone or in conjunction with any other person, directly or indirectly . . . [to] allow any person to obtain transportation for property at less than the regular rates . . . by means of false billing . . . [or] any other unjust . . . means." If this provision is read literally, the minimum number required for violation is one—the carrier.[22] (A shipper who knowingly and willfully obtains or attempts to obtain below-standard rates by such false means violates another provision, the initial paragraph of § 16.) In our opinion, however, such analysis is not entirely satisfactory.

Logically, it is possible that a carrier could provide transportation at less than the regular rate without the shipper's realizing that any false or unfair means had been used. Still, it seems reasonable to assume that often the violation would involve concerted action, *e.g.*, an agreement that the carrier will pay a rebate to the shipper. If so, it may be asserted that the mere existence of some concerted action is not a basis for going beyond the civil penalties prescribed by Congress; this supports our conclusion (derived from the legislative history) that special care should be used in selecting cases to be prosecuted under 18 U.S.C. § 371.

4. Our recommendation is that a distinction be drawn between what might

---

[21]The Wharton rule is subject to several exceptions. One is that a conspiracy prosecution is permissible when the number of conspirators exceeded the minimum number of persons required for commission of the substantive offense. *See, Iannelli* v. *United States, supra,* 420 U.S., at 782, footnote 15.

[22]The phrase "alone or in conjunction with any other person" does not alter our conclusion regarding the *minimum.*

*Cf. May* v. *United States,* 175 F. (2d) 994, 1003 (D.C. Cir., 1949), cert. denied, 338 U.S. 830 (1949) (conspiracy to commit offense of Congressman's accepting payment for services regarding a claim against the Government); *Ex parte O'Leary,* 53 F. (2d) 956, 957 (7th Cir., 1931), cert. denied, 283 U.S. 830 (1931) (conspiracy to commit offense of Federal officer's receiving a bribe). These cases applied an exception to the Wharton rule; this exception permits a conspiracy prosecution where the substantive offense (*e.g.*, accepting a bribe) is such that only one of the parties could commit it.

be called "ordinary" violations of § 16, paragraph Second, and aggravated cases. Such determinations depend of course upon the particular facts.

Particular care must be given to the bases for treating a conspiracy and a completed substantive offense as separate, that is, the "distinct kinds of threats to society that the law of conspiracy seeks to avert."[23]

Factors to be considered include the nature and extent of the conspiracy and the number of parties. For example, whether the agreement relates to an isolated transaction or to a long-continuing series of transactions.

There is no violation of paragraph Second unless false billing or some other unfair means is used. Thus, ordinarily, some concealment will be involved. When, however, the parties go to unusual lengths to conceal their conduct (e.g., the use of foreign subsidiaries[24]), there may be special risks to society. Moreover, where such a scheme is agreed upon, there may also be a sound basis for charging a conspiracy to defraud the Federal Maritime Commission.[25]

Because Congress gave primary responsibility for enforcement to the Commission, consideration should be given to the action (or the position) taken by the Commission. For example, if the question of defrauding the Commission is raised, what is its view regarding the matter?

In terms of fairness, it may be more difficult to justify proceeding with a conspiracy charge if, with regard to the underlying conduct, a civil penalty has been paid.

Our approach may be illustrated by the following hypothetical cases:

a. In the first hypothetical situation, a carrier and a shipper agree, with respect to a particular shipment or a series of shipments, that the carrier will pay a rebate to the shipper. It is understood that the rebate will be paid in cash and that the carrier's books will not disclose the true nature of the payment. The amounts involved are relatively small, and there is no history of such practices on the part of the parties involved.

We question whether a conspiracy prosecution would be appropriate in a case of this type. The parties could argue, with some force, that their conduct is at most an ordinary violation of § 16 and that Congress intended use of the sanction of civil penalties and nothing more.

b. In the second hypothetical situation, the Federal Maritime Commission obtains evidence that a carrier may be engaged in paying improper rebates. It warns the carrier that such practices are illegal. Then, the carrier and the shipper enter into a secret agreement for the payment of rebates. The agreement includes use of an elaborate scheme for making the payments—that is, several stages of laundering are effected, in part, by foreign subsidiaries of the carrier.

---

[23]*Iannelli* v. *United States, supra,* 420 U.S., at 783 (footnote omitted).

[24]Because of our basic conclusion, it is not necessary to discuss the question whether a carrier can conspire with one (or more) of its subsidiaries. *See, Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U.S. 134 (1968) (treble-damage action under Sherman Act may be based on a conspiracy between corporate entities with common ownership); Note, Developments in the Law-Criminal Conspiracy, 72 Harv. L. Rev. 920, 1000 (1959). *See also* Department of Justice, "Antitrust Guide for International Operations," (January 26, 1977), p. 12.

[25]*See, Hunsaker* v. *United States, supra,* 279 F. (2d), at 114.

Concerted action of this type would seem to pose special risks of harm to society, *e.g.*, the risk that the laundering scheme will be used to effect violations of other Federal laws. The action of the shipper and the carrier could properly be regarded as a conspiracy (1) to violate § 16, paragraph Second, and (2) to defraud the Commission.

We do not have detailed information regarding the present cases and, accordingly, are unable to make specific recommendations concerning them. We hope that the above discussion will assist you in determining how to proceed.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*